United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| P.H.,<br><br>                Plaintiff,<br><br>        v.<br><br>MARTIN O'MALLEY,<br><br>                Defendant. | Case No.  23-cv-00700-LJC<br><br>**ORDER REGARDING CROSS-MOTIONS FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 13, 17 |

## I.    INTRODUCTION

Plaintiff P.H.[1] challenges the final decision of Defendant Martin O'Malley, Commissioner of Social Security (the Commissioner),[2] finding P.H. eligible for disability benefits beginning only on August 28, 2018 rather than her alleged onset date of January 1, 2014.  The parties filed cross-motions for summary judgment under Civil Local Rule 16-5.  For the reasons discussed below, the Court GRANTS P.H.'s Motion for Summary Judgment (dkt. 13), DENIES the Commissioner's Cross-Motion for Summary Judgment (dkt. 17), and REMANDS for further proceedings.[3]

## II.    BACKGROUND

### A.    Personal and Medical History

This section summarizes the portions of the Administrative Record relevant to the parties' arguments and the outcome of this Order, and is not a complete recitation of the record or of

---

[1] Because opinions by the Court are more widely available than other filings, and this Order contains potentially sensitive medical information, this Order refers to the plaintiff only by her initials.  This Order does not alter the degree of public access to other filings in this action provided by Rule 5.2(c) of the Federal Rules of Civil Procedure and Civil Local Rule 5-1(c)(5)(B)(i).

[2] Martin O'Malley was sworn in as Commissioner of Social Security on December 20, 2023, and is therefore automatically substituted as the defendant in this case under Rule 25(d) of the Federal Rules of Civil Procedure.

[3] The parties have consented to the jurisdiction of a magistrate judge for all purposes under 28 U.S.C. § 636(c).

P.H.'s medical history.  The present Motions turn primarily on P.H.'s mental health and intellectual capacity.  One potential impairment at issue is Intellectual Order, as defined by Listing 12.05.  Because that listing looks in part to whether "the disorder began prior to your attainment of age 22," P.H.'s early life is at issue even though her she asserts a disability onset date of January 1, 2014.  Much of the record reflects treatment and assessment of physical impairments not meaningfully implicated by the parties' arguments, which this Order does not recount.

P.H. is a woman in her mid-sixties with a number of mental and physical health issues. She has received treatment for kidney cancer, including the removal of a portion of her kidney. AR at 81.

P.H. testified to the Administrative Law Judge (ALJ) that she never graduated from high school or received a GED.  AR at 72.  Her transcript indicates that she struggled in school, with her performance deteriorating over time.  She received Cs in two courses in the fall of 1972; mostly Ds in the spring of 1973;[4] all Ds and Fs in the spring of 1974; a mixture of Ds, Fs, Ps, and Ns (with Ps and Ns presumably indicating "pass" and "no credit") in the fall of 1974 and spring of 1975; and nearly all Fs and Ns (the only exceptions being two Ds) from the fall of 1975 through the spring of 1977.  AR at 589–90.  That P.H. received a total of only one course credit across her final two years of high school—consisting of half a credit for a D in Clothing III in the fall of 1975, and half a credit for a D in English III in the spring of 1977—tends to support her testimony that she did not graduate.  *See id.*  P.H. testified at a previous administrative hearing that she did well in school through twelfth grade (AR at 113), and some medical records indicate that she reported graduating from high school (AR at 683, 825), but that testimony is not consistent with the record evidence of her transcript.

P.H. briefly attended two community colleges.  She enrolled in a history course at the College of Alameda in the fall of 1977, but withdrew and received no credit.  AR at 576.  She enrolled in a modern jazz dance course and a volleyball course at Laney College in the fall of 1978, receiving credit for the former but not the latter.  AR at 576.  P.H.'s attorney informed the

United States District Court
Northern District of California

---

[4] P.H.'s transcript for the fall of 1973 is illegible.  AR at 590.

1    ALJ of the outcome of these three college courses.  AR at 72–73.

2        P.H. worked in retail for at least a few years in the 1990s plus a few months in 2008,

3    including a stint managing other employees at a coat store from 1998 to 1999.  AR at 476, 478–80.

4    P.H.'s last job was working as an in-home caregiver for a terminally ill man, which included

5    cooking meals, helping him into a wheelchair, and taking him to appointments.  AR at 74–75, 477.

6    She reported that she stopped working in that role in 2013 because she was getting sick, her

7    eyesight was failing, and she had difficulty lifting the person for whom she was caring.  AR at 74–

8    76.  The person for whom P.H. provided care was not a member of her family (AR at 79–80, 98–

9    99, 106), but is described in at least one medical report as a friend (AR at 688).

10       P.H. has at least at times used alcohol and cannabis, sometimes heavily.  *See, e.g.*, AR at

11   812 (December 2015 medical report stating that P.H. "has been drinking heavily for the past four

12   months"); *id.* at 893 (noting an observation of cannabis use that P.H. denied); *id.* at 983 (noting

13   "multiple visit[s] in ED for intoxication").

14       P.H. completed a function report in February of 2017.  Asked to describe what she did

15   from the time she woke up until she went to bed, P.H. wrote: "stare at T.V. and the walls."  AR at

16   494.  She noted that she was living in an apartment with her sister, but also asserted that she was

17   homeless.  *Id.*  Although she checked a box indicating no problems with personal care, she also

18   wrote that she needed special reminders to take care of personal needs and grooming, describing

19   the type of reminders needed as: "To take a bath everything is different".  AR at 494–95.  She

20   checked a box indicating that she did not need reminders taking medicine, but later stated that she

21   did not take medicine because she did not have a doctor, and that her sister was helping her find a

22   doctor.  AR at 495, 500.  She stated that she needed reminders from her sister to go to doctors'

23   appointments, which was the only place she went on a regular basis, AR at 497, and that she did

24   "not often" go outside, AR at 496.  Her only stated hobbies and interests were "the Lucy Show"

25   and "cartoon," and she stated that she was afraid to watch television without her sister.  AR at 497.

26   She indicated that although she could go out alone, she did not drive, and although she could

27   "handle [her] own money," she could not pay bills, count change, handle a savings account or use

28   a checkbook, and her sister shopped for her.  AR at 496.  She reported that she did her own

laundry. *Id.* at 495. A friend of P.H. provided a function report that differed as to certain details but painted a similarly restrictive overall picture, reporting that P.H. was withdrawn and angry and that she had difficulty with memory, comprehension, and adaptation. AR at 484–91.

Dr. Paul Martin, Ph.D., performed a mental status examination of P.H. on January 25, 2017 at the request of the California Department of Social Services, the state agency that evaluates Social Security disability applications in the first instance. AR at 682–85. P.H. reported depression and anxiety, as well as physical impairments, and reported that she earned a high school diploma and attended some college. AR at 682–83. Dr. Martin noted that "[c]ognitive limitations were reported" but stated that P.H. was independent for basic activities of daily living, including preparing simple meals, completing "light household chores . . . with limitations," making change at the store, and taking public transportation. *Id.* at 684. Dr. Martin reported that P.H. had a driver's license and "was able to drive a vehicle," although a family member brought her to the appointment. *Id.* at 682, 684. Dr. Martin stated that P.H. was oriented to person, place, time and situation, and characterized her attention and fund of knowledge as fair, her memory as poor (although he noted that she "recalled 3 out of 3 words after a brief delay"), and her insight and judgment as fair. *Id.* at 684. P.H. incorrectly answered $1.25 when asked the value of seven quarters. *Id.* She provided a coherent answer when asked how an orange and a banana are similar ("You have to peel them."), and when asked to explain "the saying, 'don't judge a book by its cover,'" she replied, 'Like the cover, you might like it, and it's the same thing.'" *Id.* Dr. Martin assessed a combination of mild and moderate impairments in work abilities. AR at 685. There is no indication that Dr. Martin performed any form of standardized psychological testing in preparing his 2017 report.

Two non-examining state agency psychological consultants, Drs. Daniel Gross and Peter Bradley, issued reports later in 2017 finding less severe impairments than Dr. Martin assessed, apparently relying on Dr. Martin's examination and P.H.'s lack of mental health treatment. *See* AR at 128–38, 152–61.

Dr. Lara San Pedro, Psy.D., examined P.H. on referral from her attorneys on August 28, 2018. AR at 861. Dr. San Pedro interviewed P.H., conducted clinical psychological tests

1    including the Weschler Abbreviated Scale of Intelligence (WASI-II) and the Repeatable Battery

2    for the Assessment of Neuropsychological Status (RBANS), and reviewed some of P.H.'s medical

3    records.  *Id.*  P.H. told Dr. San Pedro that "she attended high school up to 12th grade, but did not

4    graduate," and did not remember why she did not graduate.  *Id.*  P.H. also stated that she had been

5    evicted from her previous residence and was living with her sister but felt unwelcome.  AR at 862.

6    P.H. endorsed psychological symptoms including sleeplessness, anxiety, depression, and panic

7    attacks.  *Id.*  She was generally oriented to the circumstances of the evaluation and willing to

8    answer questions, but she was "emotional [and] irritated, and had difficulty understanding some

9    instructions."  AR at 863.  Dr. San Pedro assessed "poor insight and judgement."  *Id.*

10        P.H. scored 51 on the WASI-II full scale intelligence test, "which falls in the extremely

11   low range," and similarly low in verbal comprehension and perceptual reasoning.  AR at 864.  On

12   the RBANS test, she scored in the "extremely low" range for immediate memory,

13   visuospatial/constructional functioning, attention, delayed memory, and on that test's total scale.

14   *Id.* The only category where she scored higher than "extremely low" was language, where her

15   score was borderline.  *Id.*  Dr. San Pedro also diagnosed severe depression and anxiety, and mild

16   psychosis including visual hallucinations at times of severe stress, although P.H. did not meet

17   criteria for bipolar disorder or post-traumatic stress disorder.  AR at 865–66.  Dr. San Pedro

18   assessed moderate impairment in carrying out very simple instructions; marked impairments in a

19   number of functional categories (carrying out detailed instructions, maintaining concentration for

20   two-hour segments, working with others, accepting instruction and criticism from supervisors,

21   responding appropriately to changes and stressors, and maintaining regular and punctual

22   attendance); and extreme impairments in performing at a consistent pace and completing a normal

23   workday without interruption.  AR at 868.

24        Dr. Martin, who previously evaluated P.H. in 2017, evaluated her again on April 17, 2019.

25   AR at 934–38.  The results of Dr. Martin's mental status examination were similar to his previous

26   examination, except that P.H. was only able to recall one out of three words on a memory test and

27   failed to identify any similarity between an orange and a banana.  AR at 935–36.  This time,

28   however, Dr. Martin administered several clinical tests of cognitive functioning.  P.H. generally

5

scored in the "extremely low" to "borderline" range on various components of the WAIS-IV test of intellectual ability, with an "extremely low" full scale IQ of 66.  AR at 936.  She generally scored in the "extremely low" range of the WMS-IV memory test, with "borderline" results on some components.  AR at 936–37.  Her results on the trail-making test, including inability to complete a section that requires drawing lines between alternating sequences of letters and numbers, "showed *significant difficulty* with sustained attention and mental tracking" and reflected "a likelihood of neurocognitive impairment."  AR at 937.  Dr. Martin assessed mild impairments as to performing simple tasks and interacting with coworkers or the public, moderate impairment in performing detailed and complex tasks and completing a normal workday, and marked impairment in several categories (maintaining regular attendance, performing work on a consistent basis, performing work without special supervision, and dealing with usual stressors of a work environment).  AR at 937–38.  He found no significant impairment as to accepting instruction. AR at 938.

Other than brief references to P.H.'s affect in medical records primarily addressing P.H.'s physical health, the parties have not identified any other mental or cognitive treatment or assessment in the record.

**B.    Administrative Proceedings**

**1.    Five-Step Process and Listing 12.05**

The Social Security Administration uses a five-step process to determine whether claimants are entitled to disability benefits:

> Step 1. Is the claimant presently working in a substantially gainful activity? If so, then the claimant is "*not disabled*" within the meaning of the Social Security Act and is not entitled to disability insurance benefits. If the claimant is not working in a substantially gainful activity, then the claimant's case cannot be resolved at step one and the evaluation proceeds to step two. *See* 20 C.F.R. § 404.1520(b).
>
> Step 2. Is the claimant's impairment severe? If not, then the claimant is "*not disabled*" and is not entitled to disability insurance benefits. If the claimant's impairment is severe, then the claimant's case cannot be resolved at step two and the evaluation proceeds to step three. *See* 20 C.F.R. § 404.1520(c).
>
> Step 3. Does the impairment "meet or equal" one of a list of specific impairments described in the regulations? If so, the claimant is

United States District Court
Northern District of California

"*disabled*" and therefore entitled to disability insurance benefits. If the claimant's impairment neither meets nor equals one of the impairments listed in the regulations, then the claimant's case cannot be resolved at step three and the evaluation proceeds to step four. *See* 20 C.F.R. § 404.1520(d).

Step 4. Is the claimant able to do any work that he or she has done in the past? If so, then the claimant is "*not disabled*" and is not entitled to disability insurance benefits. If the claimant cannot do any work he or she did in the past, then the claimant's case cannot be resolved at step four and the evaluation proceeds to the fifth and final step. See 20 C.F.R. § 404.1520(e).

Step 5. Is the claimant able to do any other work? If not, then the claimant is "*disabled*" and therefore entitled to disability insurance benefits. *See* 20 C.F.R. § 404.1520(f)(1). If the claimant is able to do other work, then the Commissioner must establish that there are a significant number of jobs in the national economy that claimant can do. There are two ways for the Commissioner to meet the burden of showing that there is other work in "significant numbers" in the national economy that claimant can do: (1) by the testimony of a vocational expert, or (2) by reference to the Medical–Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2. If the Commissioner meets this burden, the claimant is "*not disabled*" and therefore not entitled to disability insurance benefits. *See* 20 C.F.R. §§ 404.1520(f), 404.1562. If the Commissioner cannot meet this burden, then the claimant is "*disabled*" and therefore entitled to disability benefits. *See id.*

*Tackett v. Apfel*, 180 F.3d 1094, 1098–99 (9th Cir. 1999) (footnote omitted); *see also Maxwell v. Saul*, 971 F.3d 1128, 1130 n.2 (2020).[5]  "At steps one through four, the claimant retains the burden of proof; at step five, the burden shifts to the Commissioner."  *Maxwell*, 971 F.3d at 1130 n.2.

In her arguments regarding error at Step 3, the specific impairment on which P.H. relies in Listing 12.05, Intellectual Disorder.  P.H. contends that her impairment meets or equals part B of that listing, which can be established by showing all three of the following: (1) a full scale IQ score below 70; (2) "[s]ignificant deficits in adaptive functioning currently manifested by extreme limitation of one, or marked limitation of two, of [four specified] areas of mental functioning"; and (3) evidence "that the disorder began prior to [P.H.'s] attainment of age 22."  Listing 12.05(B).

The four relevant areas of mental functioning are the abilities to: (1) "Understand,

---

[5] 20 C.F.R. § 416.920 sets forth materially identical steps to assess disability for the purpose of Supplemental Security Income benefits, which are also at issue in this case.  *See* ECF No. 17 at 6 n.1 (the Commissioner's Cross-Motion, acknowledging the congruent standards for both forms of benefits).

7

1   remember, or apply information"; (2) "Interact with others"; (3) "Concentrate, persist, or maintain

2   pace"; and (4) "Adapt or manage oneself".  Listing 12.05(B)(2).  These criteria, which also appear

3   in every other mental impairment in the Social Security Administration's Listing of Impairments,

4   are often referenced as the "paragraph B criteria."  Assessing whether a claimant's impairment

5   meets those criteria is not the same as assessing the claimant's residual functional capacity to

6   work, and if the Commissioner determines that the claimant has a mental impairment that does not

7   meet or equal a listing, then the Commissioner must conduct a more detailed analysis of the

8   claimant's residual functional capacity "by itemizing various functions contained in the broad

9   categories" of the paragraph B criteria to determine whether the claimant can perform their past

10   work or other work as required for Steps 4 and 5 above.  Social Security Ruling (SSR) 96-8p,

11   1996 WL 374184, at *4.[6]

## 2.  First ALJ Decision and Appeals Council Remand

13          P.H. applied for disability and Supplemental Security Income benefits on December 19,

14   2016, alleging an onset date of January 1, 2014.  *See* AR at 178.  After that application was

15   initially denied, an ALJ issued a partially favorable decision on September 19, 2019, finding P.H.

16   disabled beginning August 28, 2018 based on the ALJ's finding that P.H. would be off task for

17   10% of an eight-hour workday beginning on that date.  *See* AR at 192.  The Appeals Council

18   vacated that decision at P.H.'s request, finding that the ALJ failed to cite evidence supporting that

19   restriction; failed to address a potential intellectual disorder implicating Listing 12.05, as indicated

20   by P.H.'s low IQ scores; improperly relied on an absence of mental health treatment to discount

21   medical opinion evidence; did not explain the specified onset date; and failed to account for a

22   function report completed by a friend of P.H.  AR at 192–93.

23          The Appeals Council instructed the ALJ to provide P.H. an opportunity to submit

24   additional evidence; evaluate the severity of P.H.'s impairments under Listing 12.05, with specific

---

[6] SSRs are official interpretations of law and regulation issued by the Social Security Administration.  Although they do not have the force of law, they are binding on ALJs and entitled to some deference from courts, and an ALJ's failure to comply with an SSR can constitute error requiring remand under at least some circumstances.  *See Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1229 (9th Cir. 2009); *Avenetti v. Barnhart*, 456 F.3d 1122, 1124 (9th Cir. 2006); *Quang Van Han v. Bowen*, 882 F.2d 1453, 1457 n.6 (9th Cir. 1989).

findings as to each functional area; obtain evidence regarding the nature and severity of P.H.'s impairments from a medical expert "[i]f available"; further evaluate P.H.'s symptoms in compliance with applicable regulations; and, if "warranted by the expanded record," further evaluate P.H.'s residual functional capacity (RFC) and the availability of jobs that she could perform, potentially including taking further testimony from a vocational expert.  AR at 193–94.

### 3.      Second ALJ Decision

The ALJ once again found that P.H. was disabled beginning on August 28, 2018 but not before that date.[7]

#### a.      Preliminary Steps

At Step 1, the ALJ determined that P.H. had not engaged in substantial gainful activity since her alleged January 1, 2014 onset date.  AR at 23–24.  At Step 2, the ALJ found P.H.'s depressive disorder, anxiety disorder, alcohol abuse, somatic symptom disorder with predominant pain, borderline intellectual functioning, and status post multiple surgical operations to be severe impairments.  AR at 24.  The ALJ rejected several other alleged impairments either as non-severe or as not medically determinable based on record evidence.  AR at 24.

#### b.      Step 3: Listed Impairments

At Step 3, the ALJ determined that P.H.'s impairments did not meet or equal any listing. AR at 25–30.  For the period before the August 2018 onset date, the ALJ assessed moderate limitations in three functional categories (understanding, remembering, or applying information; concentrating, persisting, or maintaining pace; and adapting or managing oneself) and no limitation in interacting with others.  AR at 25.  The ALJ relied on Dr. Martin's January 2017 report as well as reports of normal interactions and generally independent living by doctors who assessed P.H.'s physical health, including Dr. Robert Tang in February 2017 and Dr. Emily Cohen in May 2017.  AR at 25–26.  The ALJ also noted that Dr. Martin's 2019 report indicated P.H. was independent for basic activities of daily living.  AR at 27.  The ALJ stated that P.H. professed

---

[7] As with the summary of P.H.'s medical history above, this summary of the ALJ's decision focuses on the cognitive impairments primarily implicated by the parties' arguments, generally omitting the ALJ's extensive discussion of P.H.'s physical impairments.

United States District Court
Northern District of California

1    some ability to care for herself and handle money in a 2017 function report, although she indicated

2    that her sister shopped for her and she needed reminders to bathe.  AR at 27.

3         Specifically addressing Listing 12.05, the ALJ stated that although Drs. San Pedro and

4    Martin assessed P.H.'s IQ at scores of 51 and 66 respectively, neither of them diagnosed her with

5    an intellectual disorder, and P.H. denied having a learning disability.  AR at 27.  The ALJ also

6    stated that the "overall record fails to evidence the requisite findings to establish such diagnoses"

7    because it did not reflect a lifelong impairment.  AR at 27–28.  The ALJ noted that P.H. presented

8    as oriented, alert, and adequately groomed in various medical records primarily addressing her

9    physical health.  AR at 28 (citing, *e.g.*, AR at 670, 825).  The ALJ acknowledged that P.H.'s

10   symptoms were exacerbated at times, characterizing such instances as sometimes occurring in

11   conjunction with notes of alcohol and cannabis use.  *Id.* (citing, *e.g.*, AR at 883 (September 2018

12   clinician notes indicating that that P.H. was homeless, confrontational, anxious, and unable to

13   advocate for herself, and that she became angry and failed to complete a prescreening session

14   when the clinician was unable to find her shelter)).  The ALJ also stated that P.H.'s activities of

15   daily living (including driving and completing household chores) and history of substantial gainful

16   activity did not "warrant more than moderate limitations in the four areas of the [paragraph] B

17   criteria" and were inconsistent with a purported inability to work due to her low IQ scores.  *Id.*

18        The ALJ characterized "inconsistencies . . . as to [P.H.'s] presentation and statements" as

19   "undermining the [her] allegations," specifically highlighting Dr. San Pedro's note that P.H. did

20   not graduate from high school as compared to P.H.'s purported "acknowledgement throughout the

21   record of completing high school without being in special education and was able [sic] to take

22   some college level classes," as well as inconsistent reporting of substance use.  AR at 29.  The

23   ALJ stated that P.H. appeared lucid and responsive at the administrative hearing.  *Id.*

24                          c.      **Residual Functional Capacity**

25        Before turning to Step 4 (whether P.H. could perform her past work), the ALJ assessed

26   P.H.'s residual functional capacity, finding that up until August 28, 2018, P.H. could perform

27   medium work with limitations to simple tasks, no more than occasional changes, and no fast-

28   paced requirements (like assembly line work).  AR at 30.  The ALJ noted that P.H. did not assert

United States District Court
Northern District of California

10

1   difficulties in completing tasks, understanding, following instructions, or getting along with others

2   on a self-completed function report, AR at 31 (citing AR at 498), and drew a negative inference

3   from what the ALJ perceived as P.H.'s efforts to avoid independent examination and "desire for

4   only [her] experts to be used," *id.*[8]  The ALJ asserted that although P.H.'s "medically determinable

5   impairments could reasonably be expected to cause the alleged symptoms," her "statements

6   concerning the intensity, persistence and limiting effects of these symptoms are not fully

7   supported for the period prior to August 28, 2018".  AR at 32; *see also* AR at 45.  The ALJ did not

8   identify specific statements that he found not credible.

9          Of P.H.'s cognitive evaluations, the ALJ afforded the most weight to Dr. Martin's January

10   2017 opinion finding only mild and moderate limitations "because he is an independent

11   consultative examiner" and because his opinions were "well supported by the many normal to

12   mild mental status exams" and the record as a whole.  AR at 49–50.  The ALJ rejected Dr.

13   Martin's finding of a moderate limitation in regular attendance on the basis that it was inconsistent

14   with P.H.'s past work before her alleged onset date.  AR at 50.  The ALJ found the opinions of

15   non-examining consultants Drs. Gross and Bradley generally well supported, but determined that

16   they somewhat understated P.H.'s limitations, particular as to the period after August 28, 2018.

17   AR at 50–51.

18          The ALJ gave "less weight to the opinions of Dr. San Pedro based on the August 28, 2018

19   exam and to the April 2019 opinion of Dr. Lewis [sic, apparently referencing Dr. Martin] of

20   mental limitations, than to those noted of Dr. Lewis [sic] from January 2017, and of Dr. Gross and

21   Dr. Bradley," finding the more restrictive opinions inconsistent with P.H.'s lack of treatment and

22   previous medical notes indicating normal mental status.  AR at 51.  The ALJ also asserted that

23   both doctors unduly relied on P.H.'s unreliable subjective reports, among other purported defects.

---

[8] On remand from the Appeals Council, the ALJ scheduled two consultative examinations in 2021, which P.H. did not attend.  She testified that she was sick, and that she was advised by her doctors to avoid any potential COVID exposure at that time because she was undergoing treatment for cancer.  AR at 75–78.  As P.H. notes in her Motion, she attended multiple previous independent examinations ordered by the state agency—including with Dr. Martin, whose 2019 opinion forms one basis for her present Motion.  Because the Commissioner's Cross-Motion does not defend the ALJ's drawing of a negative inference, the Court does not consider that inference as evidence supporting the ALJ's decision.

United States District Court
Northern District of California

AR at 51–52.

For the period after August 28, 2018, the ALJ determined that worsening symptoms (including memory deficits) would require P.H. to be off task for ten percent or more of a typical workday, and that she was limited to light work.  AR at 32, 54.

### d.      Steps 4 and 5: Ability to Perform Past or Other Work

Based on testimony from a vocational expert, the ALJ determined at Step 4 that P.H. was unable to perform her past work at any time after her alleged 2014 onset date.  AR at 54–55.

At Step 5, the ALJ relied on the vocational expert's testimony that the residual functional capacity the ALJ assessed for the period preceding August 28, 2018 would allow P.H. to perform other work available in the national economy.  AR at 55–57.  For the period from that date onwards, however, the ALJ determined that the combination of P.H.'s age, education, work experience, and restriction to light work compelled a finding of disability under applicable medical-vocational rules.  AR at 57.

The ALJ noted inconsistent reports of P.H.'s use of alcohol and cannabis, but concluded that her symptoms persisted even in periods of abstinence, and that her substance use was therefore not material to the determination of disability.  AR at 44, 57.  The ALJ therefore concluded that P.H. was disabled as of August 28, 2018, but not disabled before that date.  AR at 57.

The Appeals Council denied P.H.'s request to review that decision, rendering it the final decision of the Commissioner.  AR at 1.

### C.      The Parties' Arguments

#### 1.      P.H.'s Motion for Summary Judgment

P.H. contends that the ALJ erred in finding that her intellectual impairments do not meet or equal Listing 12.05, Intellectual Disorder, specifically part B of that listing.  ECF No. 13 at 9–24. According to P.H., the 2019 opinion of Dr. Martin and particularly the 2018 opinion of Dr. San Pedro demonstrate that P.H.'s low IQ score and limitations with respect to the paragraph B criteria meet that listing, and her academic records demonstrate similar difficulties dating to before she was 22 years old.  *Id.* at 10–11, 15–17.  P.H. argues that the reasons the ALJ provided for

1    disregarding those doctors' opinions are insufficient and unfounded, and asks the Court to credit

2    those opinions as true and remand for an award of benefits beginning from her 2014 alleged onset

3    date. *Id.* at 11, 19–24.

4            Addressing the ALJ's other stated reasons for declining to find that P.H. met or equaled

5    Listing 12.05, P.H. begins with her past work and activities of daily living.  She cites precedent

6    holding that past low-skill work does not preclude a finding of disability based on Intellectual

7    Disorder, and contends that the listing looks to whether deficits in functioning are "'currently

8    manifested.'"  *Id.* at 12 (quoting Listing 12.05B(2)).  P.H. argues that no evidence supports the

9    ALJ's conclusion that she drives independently is not supported by the record, nor that she uses

10   public transportation independently to any meaningful degree.  *Id.* at 12–13. According to P.H.,

11   the ALJ failed to identify specific activities of daily living inconsistent with Intellectual Disorder,

12   and the record as a whole indicates that her activities were severely limited.  *Id.*

13           P.H. contends that the ALJ improperly relied on a lack of mental health treatment to find

14   her not disabled, in contravention of the Appeals Council's instructions and Social Security Ruling

15   16-3p, which required the ALJ to consider potential explanations for a lack of treatment like

16   P.H.'s history of homelessness.  *Id.* at 13–15.  P.H. argues that the failure of Drs. Pedro and San

17   Martin to diagnose her specifically with Intellectual Disorders is not a reason to set aside their

18   findings, which meet the listing definition for that disorder.  *Id.* at 15.  She also contends that the

19   ALJ placed improper weight on her own testimony that she did not have a learning disability, and

20   on the ALJ's own non-expert impressions of P.H.'s demeanor during her testimony.  *Id.* at 17–18.

21           P.H. also argues that the ALJ abused his discretion by not taking testimony from a medical

22   expert, *id.* at 25–26, that the ALJ did not provide sufficient reasons to reject P.H.'s testimony

23   about her symptoms, *id.* at 26–27, that the ALJ failed to support his conclusion that P.H.'s ten

24   percent time-off-task restriction began on precisely August 28, 2018, *id.* at 27, and that the ALJ

25   erred in affording more weight to older medical opinions than to more recent opinions from other

26   doctors, *id.* at 28.

27           **2.      The Commissioner's Cross-Motion**

28           The Commissioner contends that any question of whether the ALJ complied with the

1    Appeals Council's instructions is not properly before this Court, which has jurisdiction only to

2    review the Commissioner's *final* decision.  ECF No. 17 at 9–10.  The Commissioner notes that the

3    Appeals Council declined to disturb the ALJ's second decision.  *Id.* at 10.

4         The Commissioner argues that P.H.'s work history supports the ALJ's decision, and the

5    ALJ properly considered that history in assessing a P.H.'s adaptive functioning under Listing

6    12.05.  *Id.* at 11–12.  According to the Commissioner, P.H.'s jobs in retail and providing in-home

7    care were skilled work, and the ALJ correctly relied on the fact that P.H. was held to county

8    standards for in-home care without any indication of special support.  *Id.* at 12.  The

9    Commissioner also notes that P.H. worked as a supervisor in a coat shop for a year.  *Id.*  The

10   Commissioner contends that P.H.'s work history alone precludes her meeting Listing 12.05,

11   because it demonstrates that she did not have disabling intellectual disorder dating to before she

12   was 22 years old.  *Id.* at 12–13.

13        The Commissioner contends that some mental status examinations in the record revealed

14   normal or mild findings, and that P.H. demonstrated adequate social functioning in interactions

15   with medical professionals and the ALJ.  *Id.* at 13–14, 17.  The Commissioner also argues that

16   P.H.'s claim of disability is undermined by her activities of daily living as identified by the ALJ:

17   "'independently navigating travel by driving, taking public transportation, obtaining a valid

18   driver's license, doing chores like doing laundry and cleaning the house, at times preparing simple

19   meals, handling personal care, working in retail and caring for others, handling her own money,

20   engaging in social activity'".  *Id.* at 14 (quoting AR at 28).  The Commissioner acknowledges

21   P.H.'s contention that she no longer drives or uses public transportation, but argues that her past

22   ability to do so supports the ALJ's rejection of Listing 12.05 and determination of a later onset

23   date than P.H. alleged.  *Id.* at 14 n.9.

24        The Commissioner argues that P.H.'s failure to pursue mental health treatment and comply

25   with instructions to limit her alcohol and tobacco use also undermine her claim of intellectual

26   disability.  *Id.* at 15–16.

27        The Commissioner contends that the ALJ properly relied on P.H.'s testimony that she

28   performed well in school through twelfth grade and attended college.  *Id.* at 16.  The

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Commissioner characterizes the inconvenient evidence of P.H.'s high school transcript as

2    "illegible," incorrectly asserts that the record lacks transcripts from 1976 and 1977, and faults P.H.

3    for failing to provide "pinpoint citations," although the Commissioner identifies the correct record

4    citation for the transcript.  *Id.* at 16–17 (citing AR at 589–97).

5         Turning to medical opinion evidence, the Commissioner argues that the ALJ correctly

6    relied on the January 2017 opinion of examining psychologist Dr. Martin.  The Commissioner also

7    asserts that the ALJ correctly relied in part on non-examining doctors' conclusions later that year

8    based on their review of medical records that included Dr. Martin's examination findings.  *Id.* at

9    19–20.  The Commissioner contends that the ALJ properly rejected Dr. Martin's subsequent 2019

10   report, as well as Dr. San Pedro's 2018 report (which the Commissioner inaccurately describes as

11   occurring in 2017), because the significant impairments that those doctors assessed were

12   inconsistent with P.H.'s interactions with other medical professionals, activities of daily living,

13   and lack of mental health treatment.  *Id.* at 20–22.  The Commissioner also argues that any error in

14   the treatment of Dr. Martin's 2019 report is harmless because that report postdated P.H.'s

15   disability onset date as determined by the ALJ.  *Id.* at 20.

16        Finally, the Commissioner asserts that P.H.'s inconsistent statements about her educational

17   background and substance use are in themselves "inconsistent with finding she had an intellectual

18   disorder of Listing severity."  *Id.* at 23–24.  The Commissioner cites a "Danish longitudinal study"

19   finding a connection between alcohol abuse and declining intelligence scores, and argues that

20   P.H.'s failure to disclose alcohol abuse to the examining doctors "makes the testing providers'

21   assessments of her actual abilities less reliable."  *Id.* at 24 & n.14.

22        If the Court finds any error in the ALJ's decision, the Commissioner contends that the

23   Court should remand for further proceedings rather than an award of benefits.  *Id.* at 25–26.

24            **3.      P.H.'s Reply**

25        P.H. contends that the ALJ's departure from the Appeals Council's instructions violates 20

26   C.F.R. § 404.977(b), which requires any proceedings after remand from the Appeals Council to

27   comply with the terms of the remand order.  ECF No. 18 at 3.  She argues that this case differs

28   from others where an Appeals Council reversal simply required an ALJ to make further findings,

15

1   because the ALJ here disregarded a specific finding by the Appeals Council that an absence of

2   mental health treatment is not inconsistent with Intellectual Disorder.  *Id.* at 2–3.

3       With respect to her past work, P.H. argues that the ALJ made no specific finding that such

4   work was skilled, and that the Commissioner cannot now rely on purported evidence that the work

5   was skilled when the ALJ cited no such evidence.  *Id.* at 4.  P.H. contends that her work as a home

6   health aide was "semi-skilled," not "skilled," and that skill level in the Social Security context

7   refers to the time needed to learn a job rather than the level of intelligence required to do so.  *Id.* at

8   4–5.  She also argues that Listing 12.05 looks to impairments as "currently manifested," and that

9   Social Security Administration regulations specifically "'do not require evidence that [an]

10   impairment met all of the requirements of 12.05A or 12.05B prior to age 22,'" nor that a claimant

11   met the "'statutory definition of disability prior to age 22.'"  *Id.* at 6–7 (quoting 20 C.F.R. pt. 404,

12   subpt. P, appx. 1, § 12.00(H)(4)).  P.H. asserts that her high school transcript provides sufficient

13   evidence of an impairment before she reached the age of 22.  *Id.* at 7–8.

14       According to P.H., the Commissioner's arguments regarding her activities of daily living

15   fail to account for differences between ability to function at home and ability to function in a

16   workplace, a distinction that Social Security regulations require the Commissioner to consider.  *Id.*

17   at 8.  P.H. contends that the ALJ did not identify specific activities that were inconsistent with the

18   marked or extreme workplace limitations assessed by Drs. Martin and San Pedro, and that the

19   record reflects that she spent most days resting at home.  *Id.* at 9.

20       Finally, P.H. argues that the ALJ's error in evaluating Dr. Martin's 2019 report is not

21   harmless because Social Security procedures allow for determining an onset date that precedes

22   medical examination.  *Id.* at 9–10 (citing SSR 18-1p(I)(B)(2)).

23   **III.    ANALYSIS**

24       **A.    Legal Standard**

25       In cases challenging the denial of disability benefits, district courts have authority to

26   review and "affirm[], modify[], or revers[e] the decision of the Commissioner of Social Security,

27   with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  "An ALJ's disability

28   determination should be upheld unless it contains legal error or is not supported by substantial

*United States District Court*
*Northern District of California*

1   evidence," which "'means more than a mere scintilla, but less than a preponderance; it is such

2   relevant evidence as a reasonable person might accept as adequate to support a conclusion.'"

3   *Garrison v. Colvin*, 759 F.3d 995, 1009 (9th Cir. 2014) (quoting *Lingenfelter v. Astrue*, 504 F.3d

4   1028, 1035 (9th Cir. 2007)).  A court must consider evidence both supporting and detracting from

5   the Commissioner's decision; if the evidence could reasonably support either outcome, the court

6   may not substitute its judgment for that of the ALJ.  *Id.* at 1010.  Courts "review only the reasons

7   provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon

8   which he did not rely."  *Id.*

9       **B.      Opinions of Dr. San Pedro and Dr. Martin**

10      Because P.H.'s claim was filed before March 27, 2017, it is governed by the regulations in

11  effect at that time, which required the Commissioner to "to give greater weight to certain medical

12  opinions."  *Farlow v. Kijakazi*, 53 F.4th 485, 488 (9th Cir. 2022).  "Opinions from treating

13  physicians receive more weight than opinions from examining physicians, and opinions from

14  examining physicians receive more weight than opinions from non-examining physicians. . . . To

15  reject the uncontested opinion of an examining or treating doctor, an ALJ must provide 'clear and

16  convincing' reasons supported by substantial evidence."  *Id.*  Rejecting a contradicted opinion of a

17  treating or examining physician requires "'specific and legitimate reasons' supported by

18  substantial evidence".  *Lester v. Chater*, 81 F.3d 821, 831 (9th Cir. 1995).[9]

19      As discussed below, the ALJ did not provide sufficient reasons to reject the 2018 opinions

20  of Dr. San Pedro or the 2019 opinions of Dr. Martin.

21      **1.      The ALJ Erred in Evaluating Dr. San Pedro's 2018 Report**

22      As discussed above, Dr. San Pedro assessed marked impairments in most functional

23  abilities that she considered, extreme limitations in performing at a consistent pace without

24  reasonable rest breaks, and extreme limitations in completing a normal workday without

25  psychological interruptions.  AR at 868.  The ALJ's reasons for rejecting Dr. San Pedro's opinions

26  were as follows: (1) Dr. San Pedro was not P.H.'s treating psychologist; (2) Dr. San Pedro's

27

28  [9] As addressed in *Farlow*, 53 F.4th at 488, *Lester* has been superseded as to more recent disability
    claims but states the applicable standard for claims subject to the older regulatory scheme.

United States District Court
Northern District of California

17

1   findings of marked and extreme limitations were not consistent with P.H.'s lack of prior treatment

2   or the lack of any prior similar medical opinions; and (3) "it appears that Dr. San Pedro heavily

3   relied upon the claimant's subjective report of symptoms and limitations," but P.H. demonstrated

4   inconsistent reporting of her educational history and substance use.  AR at 51.  The Court

5   addresses those reasons in sequence.

6          First, although treating doctors are entitled to greater weight than examining doctors under

7   the pre-2017 regulations that apply to this case, rejecting the uncontradicted opinion of an

8   examining doctor still requires "clear and convincing reasons."  *Farlow*, 53 F.4th at 488.  There is

9   no indication that any doctor treated P.H. for mental health or intellectual impairments, and thus

10  no more authoritative opinion is available.  Nor did the ALJ identify any other contemporaneous

11  source as contradicting Dr. San Pedro's conclusions.  As the ALJ acknowledged, P.H.'s symptoms

12  appeared to be increasing in severity at the time.  *E.g.*, AR at 50 (acknowledging "an apparent

13  worsening of her condition over time" and "evidence of memory difficulties" since the time of Dr.

14  San Pedro's examination).  Dr. Martin's January 2017 examination report, and the reports of two

15  non-examining consultants who relied on that examination, speak to P.H.'s condition at the time

16  of that examination and thus do not necessarily serve to contradict Dr. San Pedro's assessment of

17  P.H.'s capacity around a year and a half later.  Dr. Martin's 2019 report also differed in some

18  respects from Dr. San Pedro's report, but the ALJ did not rely on those discrepancies as grounds to

19  reject either report, and it is not clear to what extent such discrepancies might reflect actual

20  changes in P.H.'s symptoms over time.  In any event, the ALJ was required to provide at least

21  specific and legitimate reasons, if not clear and convincing reasons, to reject Dr. San Pedro's

22  opinions.  *See Lester*, 81 F.3d at 831.  Given that the regulations at issue afford significant

23  deference to examining doctors, the mere fact that Dr. San Pedro examined rather than treated

24  P.H. does not meet standard.

25         Second, a lack of mental health treatment is neither a clear and convincing reason nor

26  specific and legitimate reason to reject medical opinion evidence of cognitive impairments.  The

27  Commissioner's reliance on authority addressing reasonable inferences that can be drawn from a

28  claimant's failure to seek or comply with treatment for purportedly disabling *pain* is not applicable

United States District Court
Northern District of California

or persuasive.  ECF No. 17 at 15 (citing *Orn v. Astrue*, 495 F.3d 625, 638 (9th Cir. 2007)).  It is self-evident that a mentally capable person suffering from extreme physical pain would typically take steps to mitigate that pain.  The Commissioner does not explain how the same inference should extend to intellectual disabilities, or in other words, why someone whose reasoning abilities are significantly impaired would be *more* likely to pursue treatment than someone without such impairments.[10]  To the contrary, "'it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation.'"  *Garrison*, 759 F.3d at 1018 n.24 (quoting *Nguyen v. Chater*, 100 F.3d 1462, 1465 (9th Cir. 1996)).  P.H.'s failure to seek treatment or comply with instructions thus does not provide substantial evidence for the ALJ's conclusion that her mental impairment did not meet or equal Listing 12.05.  Although the Court's conclusion is consistent with the Appeals Council's recognition that intellectual disorder "does not necessarily require ongoing medical treatment," AR at 192, the Court does not reach the parties' arguments as to whether the ALJ's apparent deviation from the Appeals Council's remand order is itself an error cognizable by this Court.

Finally, contrary to the ALJ's assertion that Dr. San Pedro's conclusions were based on P.H.'s unreliable subjective statements, Dr. San Pedro specifically attributed her assessment in significant part to the results of the objective psychological tests she applied, which demonstrated severe impairments.  AR at 867 ("As the RBANS neurocognitive testing indicates, her extremely low scores in immediate and delayed memory skills indicate that activities such as remembering and following through on important tasks . . . may be negatively affected."); *see id.* at 864 (reporting "extremely low" results on the WASI-II IQ test and all but one section of the RBANS test).  Although the ALJ acknowledged that Dr. San Pedro performed those tests, the results of which the ALJ's decision recounts, the ALJ presented no specific reasons to reject the validity of those tests.  AR at 51.[11]  In any event, to the extent that Dr. San Pedro relied in part on P.H.'s

---

[10] The Commissioner also asserts that P.H.'s "failure to follow her providers' recommendations to terminate her use of alcohol and tobacco was consistent with finding that she did not have an adaptive deficit rising to Listing level severity."  ECF No. 17 at 16.  The Commissioner does not explain why an intellectually impaired person would be more likely to cease using addictive substances than someone without such impairments.

[11] Dr. San Pedro's narrative description of P.H.'s RBANS results is not entirely consistent with the

1   reports, the ALJ found P.H.'s statements "generally support[ed] . . . for the period since August

2   28, 2018," AR at 32, suggesting that Dr. San Pedro's reliance on P.H.'s statements on that date

3   would have provided accurate information for her report.

4       The ALJ therefore erred in failing to provide sufficient reasons for affording little weight

5   to Dr. San Pedro's report.

6           **2.      The ALJ Erred in Evaluating Dr. Martin's 2019 Report**

7       As with Dr. San Pedro's report, the ALJ summarily dismissed Dr. Martin's 2019 report on

8   the grounds that he was an examining physician and that he based his conclusions on P.H.'s

9   unreliable reporting.  The ALJ asserted, "Rather than having a basis in objective findings or

10  established treatment history, [Dr. Martin's 2019] opinion appears to rely on the claimant's

11  subjective report of symptoms of on depression and anxiety and not on any intellectual disorder."

12  AR at 52.  Although the ALJ acknowledged that Dr. Martin assessed a full-scale IQ score of 61,

13  the ALJ failed to explain why that is not an "objective finding" of "any intellectual disorder" that

14  supports Dr. Martin's opinions, and simply ignored Dr. Martin's other objective tests (the WMS-

15  IV memory test, the trail-making test, and more specific aspects of the WAIS-IV intellectual

16  ability test) that demonstrated similarly severe deficiencies.  *See* AR at 936–37.  The ALJ's

17  assertion that *this* report lacked objective findings is particularly strange when the ALJ afforded

18  greater weight to Dr. Martin's earlier 2017 report, which largely lacked objective testing and relied

19  more heavily on P.H.'s self-reported capabilities and symptoms.  *See* AR at 682–85.  As discussed

20  above, the ALJ also specifically found that P.H.'s statements regarding symptoms were "generally

21  supported" from August 28, 2018 onward, AR at 32, so any reliance by Dr. Martin on P.H.'s

22  statements in 2019 would not tend to diminish the accuracy of his conclusions.

23      As a further reason for rejecting the 2019 report, the ALJ noted that P.H. "takes no

24

25  ─────────────────────
    scores that she reports.  For example, Dr. San Pedro states in her narrative that P.H. scored in the
26  "low average" range for attention, after reporting a score in the "extremely low" range.  AR at
    864.  The ALJ did not address that discrepancy, however—nor does the Commissioner's brief—
27  and the Court cannot affirm the ALJ based on reasons the ALJ did not provide.  *Garrison*, 759
    F.3d at 1010.  Moreover, even assuming for the sake of argument that this discrepancy could have
28  been a sufficient reason to reject Dr. San Pedro's report, other deficiencies identified in this Order
    would still require remand.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    medication for mental health conditions and has limited treatment for it." AR at 52.  Yet, the ALJ

2    does not explain what medication P.H. might be expected to take for impairments arising from

3    intellectual deficiencies.  As discussed above, a claimant's failure to seek treatment for mental or

4    intellectual disorders is at best weak evidence that such disorders are not severe.  *See Garrison*,

5    759 F.3d at 1018 n.24.  The ALJ also noted that Dr. Martin still considered P.H. capable of

6    managing her own funds.  AR at 52.  That assessment might be inconsistent with Dr. Martin's

7    other conclusions regarding severe deficiencies, arguably discrediting the single sentence asserting

8    that P.H. could manage her money independently, *see* AR at  938.  The ALJ, however, does not

9    explain why such an inconsistency instead warrants rejecting Dr. Martin's otherwise

10   comprehensive assessment of significant impairments.

11           The ALJ's decision also suggests that both Dr. Martin and Dr. San Pedro's failure to

12   specifically diagnose "intellectual disorder" undermined the credibility of their reports.  *See* AR at

13   27.  The criteria of Listing 12.05 are based on the effects of a claimant's impairment, not whether

14   the claimant received a particular diagnosis.  The listing "does not require a diagnosis of an

15   intellectual disorder."  *Ken M. ex rel. Berry M. v. Berryhill*, 340 F. Supp. 3d 1070, 1078 (W.D.

16   Wash. 2018).  The ALJ erred by relying on Drs. Martin and San Pedro's failure to specifically

17   diagnose intellectual disorder as a reason to disregard their assessments of other objective criteria

18   relevant to Listing 12.05, such as significant functional limitations.

19           That leaves the ALJ's citation to various medical records noting P.H.'s normal affect,

20   adequate grooming, or the like.  AR at 52 (citing, *e.g.*, AR at 845–60: notes from Bay Area Retina

21   Associates, treating P.H.'s vision impairments, indicating "Alert and oriented" mental status).

22   Such passing references from doctors addressing physical medical concerns are neither "clear and

23   convincing" nor "specific and legitimate" reasons to set aside the conclusions of the only mental

24   health doctors who examined P.H.—particularly where, as the ALJ acknowledged, some such

25   notes indicated more severe symptoms.  *See, e.g.*, AR at 883 (reporting poor activities of daily

26   living, dirty attire, confrontational and anxious affect, and angry outbursts that prevented

27   completing a prescreening for housing assistance); AR at 894 (describing P.H.'s mood as angry,

28   anxious, and inappropriate); AR at 916 (noting that P.H. refused to allow a repeat check of vital

1    signs); AR at 983 (reporting a "[d]ifficult" evaluation in which P.H. was aggressive, defensive,

2    verbally abusive, and unwilling to provide straightforward answers).

3          Accordingly, the ALJ erred in failing to provide sufficient reasons for affording little

4    weight to Dr. Martin's 2019 report.

5                      **3.    Harmless Error Analysis and Appropriate Remedy**

6          The Commissioner contends that any error in the ALJ's treatment of Dr. Martin's 2019

7    report was harmless because that report came after August 28, 2018, the date that the ALJ has

8    already determined P.H. established disability.  ECF No. 17 at 20.  The same argument would

9    seem to apply to Dr. San Pedro's report issued *on* August 28, 2018, although the Commissioner's

10   brief does not apply this argument to Dr. San Pedro's report—perhaps because the Commissioner

11   erroneously characterizes that report as having been issued in 2017.  *See id.*

12         The Court is not persuaded that these reports are necessarily irrelevant to whether P.H. was

13   disabled earlier than the ALJ assessed.  As P.H. correctly notes, a disability onset date "'may

14   predate the claimant's earliest recorded medical examination or the date of the claimant's earliest

15   medical records.'"  ECF No. 18 at 9–10 (quoting SSR 18-1p).  It stands to reason that if the ALJ

16   credited either or both of these reports as demonstrating more severe impairments on or after the

17   currently-assessed 2018 onset date, such a conclusion could perhaps inform the ALJ's assessment

18   of P.H.'s prior symptom statements, call into question the weight that the ALJ afforded to the

19   milder conclusions of Dr. Martin's prior January 2017 report, or support an inference that at least

20   somewhat more severe impairments arose at some point before the date of Dr. San Pedro's report.

21   The Commissioner should consider such issues on remand.

22         P.H. asks the Court to remand for a calculation of benefits under the "credit-as-true" rule, a

23   narrow exception to the usual approach of remanding for further administrative proceedings to

24   address any error.  That doctrine applies only when the following three elements are established:

25               (1) the record has been fully developed and further administrative
                 proceedings would serve no useful purpose; (2) the ALJ has failed to
26               provide legally sufficient reasons for rejecting evidence, whether
                 claimant testimony or medical opinion; and (3) if the improperly
27               discredited evidence were credited as true, the ALJ would be required
                 to find the claimant disabled on remand
28

United States District Court
Northern District of California

1    *Garrison*, 759 F.3d at 1020.  Here, although the ALJ failed to provide sufficient reasons for

2    rejecting the 2018 and 2019 reports, the other two elements are not met.  As addressed above in

3    the Commissioner's harmless error argument, neither report speaks directly to the degree of P.H.'s

4    impairment before the dates those reports were issued, so although they might *inform* the ALJ's

5    assessment of P.H.'s impairment in preceding years, crediting either of them as true would not

6    *necessarily* require the ALJ to find P.H. disabled at any point before the already-established onset

7    date.  The reports also do not speak to whether P.H.'s disorder began prior to age 22, a necessary

8    element for finding disability under Listing 12.05(B).  Finally, the two reports differ from each

9    other in potentially material respects, so further administrative proceedings would serve a useful

10   and necessary purpose of addressing those discrepancies in the first instance.  *Compare, e.g.*, AR

11   at 868 (Dr. San Pedro's report, finding marked impairment in accepting instructions and

12   responding to criticism, as well as in working with others and interacting with the public), *with*

13   AR at 938 (Dr. Martin's 2019 report, finding no significant impairment in accepting instructions

14   and mild impairment in interacting with coworkers and the public).

15         This Court therefore applies the "ordinary remand rule," and remands for further

16   proceedings to properly address these reports.  *See Treichler v. Comm'r of Soc. Sec. Admin.*, 775

17   F.3d 1090, 1099 (9th Cir. 2014).

18         **C.      Assessment of Educational History**

19         The ALJ relied on P.H.'s purported "acknowledgment throughout the record of completing

20   high school" to minimize P.H.'s claimed intellectual limitations and reject certain opinion

21   evidence, including reports where doctors indicated that P.H. did not graduate from high school.

22   *See* AR at 29.  The ALJ asserted that P.H. "graduated from high school in 1977 without being in

23   special education, which is not consistent with disability due to BIF," or borderline intellectual

24   functioning.  *Id.*

25         The ALJ cited only two instances in the record as purportedly indicating that P.H.

26   graduated: Dr. Martin's January 2017 report (AR at 683),[12] and a May 2017 report by Dr. Emily

27   _____

28   [12] Although not cited by the ALJ for this issue, Dr. Martin's 2019 report also indicated that P.H.
     graduated from high school.  AR at 935.

1    Cohen (AR at 825).  The ALJ ignored P.H.'s hearing testimony that she neither graduated nor

2    obtained a GED.  *See* AR at 72.  The ALJ also ignored P.H.'s high school transcript, despite her

3    attorney having flagged at the administrative hearing and in a letter to the ALJ that P.H.'s high

4    school records were included in the administrative record.  AR at 72, 613.  Contrary to the

5    Commissioner's assertions, the transcript is largely legible, clearly stating the grades and credit

6    P.H. received for all semesters except fall 1973, which indicate extremely poor performance that

7    appears unlikely to have led to graduation.  AR at 589–90.  Even if P.H. in fact obtained a diploma

8    (a possibility that the record does not *conclusively* negate), her transcript reflects—among other

9    deficiencies—that P.H. received almost no course credit in her final two years due to largely

10   failing academic performance.  Any diploma obtained under such circumstances would not be

11   significant evidence of P.H.'s ability to complete high school coursework.

12          In the face of conflicting statements as to whether P.H. graduated from high school, the

13   ALJ presumed without evidence (and contrary to the record evidence of P.H.'s transcript) that she

14   graduated, and then relied on that presumption to conclude that the (apparently correct) statements

15   to the contrary "undermin[ed] the claimant's allegations."  AR at 29.  That presumption, which

16   informed the ALJ's overall conclusion that P.H. did not have a history of intellectual disability as

17   required for Listing 12.05, was not supported by substantial evidence.

18          As for P.H.'s professed lack of special education, the ALJ did not address the extent to

19   which potentially applicable special education would have been available to P.H. in the late 1970s,

20   nor did he indicate (or identify evidence showing) that P.H. was evaluated for special education at

21   that time and found not to qualify.  Moreover, P.H. provided inconsistent statements as to whether

22   she graduated at all, and she told Dr. San Pedro that she did not know why she did not graduate.

23   AR at 861.  It is therefore not obvious that P.H.'s statements about whether she received special

24   education were reliable.  The ALJ provided no explanation for why he considered such statements

25   to be accurate.

26          To the extent that the ALJ relied on P.H. having attended college, he failed to address the

27   context that such attendance consisted, in its entirety, of: (1) enrolling in and then withdrawing

28   from a history course; (2) failing to obtain credit for a physical education volleyball course; and

United States District Court
Northern District of California

1   (3) obtaining credit for a single physical education course in jazz dance.  AR at 576.  The

2   implication that such limited attendance in largely nonacademic courses evinces unimpaired

3   intellectual functioning is not supported by substantial evidence.

4       **D.    Activities of Daily Living and Past Work Experience**

5       Social Security Administration regulations provides that claimants "engag[ing] in common

6   everyday activities, such as caring for . . . personal needs, preparing simple meals, or driving a car,

7   will not always mean that [claimants] do not have deficits in adaptive functioning as required" to

8   establish listing-level Intellectual Disorder under Listing 12.05(B).  20 C.F.R. pt. 404, subpt. P,

9   appx. 1, § 12.00(H)(3)(d)(i).  Whether such activities demonstrate sufficient functioning to

10  preclude disability can "rest on whether [claimants perform] daily activities independently,

11  appropriately, effectively, and on a sustained basis."  *Id.* § 12.00(H)(3)(d)(ii).  More broadly, even

12  aside from the specific context of Listing 12.05, an "ALJ must make specific findings relating to

13  the daily activities and their transferability to a work setting."  *Orn v. Astrue*, 495 F.3d 625, 639

14  (9th Cir. 2007) (cleaned up); *see also Weirick v. Saul*, 825 F. App'x 446, 449 (9th Cir. 2020).

15      The activities on which the ALJ relied here ("driving, taking public transportation,

16  obtaining a valid driver's license, doing chores like doing laundry and cleaning the house, at times

17  preparing simple meals, handling personal care," AR at 28) are precisely the sort of simple

18  everyday activity that does not necessarily preclude disability under Listing 12.05.  Whether P.H.

19  performed some of those activities at all after her alleged onset date is questionable—the ALJ cites

20  no evidence, for example, that P.H. actually drove anywhere during the time at issue, as opposed

21  to merely professing an ability to do so or having a driver's license.  *See, e.g.*, AR at 682, 684 (Dr.

22  Martin's 2017 report, stating that P.H. indicated she could drive but "was brought by a family

23  member").  Regardless, neither the ALJ's decision nor the Commissioner's Cross-Motion

24  identifies any evidence that P.H. performed any of those activities "independently, appropriately,

25  effectively, [or] on a sustained basis," *see* 20 C.F.R. pt. 404, subpt. P, appx. 1,

26  § 12.00(H)(3)(d)(ii), nor did the ALJ make any findings of transferability to a work setting, *see*

27  *Orn*, 495 F.3d at 639.

28      The ALJ's decision also conflates the standard for showing a current impairment sufficient

United States District Court
Northern District of California

25

1    to establish disability with the standard for showing a lifelong condition arising before the age of

2    22.  *See, e.g.*, AR at 28 (citing P.H.'s past work before her alleged onset date as demonstrating no

3    more than moderate limitations for the purpose of the paragraph B criteria).  In addressing the

4    paragraph B criteria, Listing 12.05 requires deficits "currently manifested" by marked or extreme

5    limitations, not a lifelong history of such severe limitations.  20 C.F.R. pt. 404, subpt. P, appx. 1,

6    § 12.05(B)(2).  Although a claimant must present evidence indicating that the "mental disorder

7    began prior to age 22," applicable regulations "do not require evidence that [the] impairment met

8    all of the requirements of 12.05A or 12.05B prior to age 22," or that the claimant "met [the]

9    statutory definition of disability prior to age 22."  *Id.* § 12.00(H)(4).  In other words, the

10   regulations contemplate that a *disorder* can *begin* before the age of 22, but only become a

11   *disabling impairment* later in life.

12        The regulations identify "reports from employers" as an example of evidence claimants

13   can submit to show when their disorder began, further implying that past work is not inconsistent

14   with demonstrating the start of a "disorder."  *See id.* § 12.00(H)(4)(f); *see also Fanning v. Bowen*,

15   827 F.2d 631, 634 (9th Cir. 1987) (concluding that past work did not preclude a finding of

16   disability under a previous version of Listing 12.05).[13]  "Reports of . . . academic performance"

17   are another example of evidence that can demonstrate the beginning of a disorder, and the

18   Commissioner should consider on remand whether P.H.'s high school transcript satisfies that test.

19   20 C.F.R. pt. 404, subpt. P, appx. 1, § 12.00(H)(d).

20        By treating simple activities of daily living as establishing per se that P.H. was not

21   disabled, and by treating work prior to P.H.'s alleged onset date as inconsistent with the sort of

22   deficits that Listing 12.05(b) only requires claimants to show are "currently manifest," the ALJ

23   erred in applying incorrect legal standards.  The ALJ's decision does not identify substantial

24   evidence to support a finding of non-disability under the regulatory standards addressed above.

25

26   _____

27   [13] Section 12.00(H)(3)(e) addresses how work activity can inform the assessment of "deficits in
     adaptive functioning as required by 12.05B2," but since a claimant need not establish such deficits
     predating their alleged onset date, *see* § 12.00(H)(4), that provision is best understood as
     addressing how work activity *during the alleged period of disability* affects a claim, not work

28   prior to an alleged onset date, as is at issue here.

United States District Court
Northern District of California

1

**E.    Other Arguments Asserted by the Commissioner**

2      The Commissioner's Motion and the ALJ's decision rely in part on a May 2017 report

3  from Dr. Emily Cohen indicating that P.H. "'was cooperative, well groomed, alert and oriented,

4  and though tearful during the interview she had good eye contact and was able to follow

5  instructions during the course of the examination.'"  ECF No. 17 at 13 (quoting AR at 26 and

6  citing AR at 825).  Dr. Cohen performed a physical examination and assessed P.H.'s ability to sit,

7  stand, and walk, among other physical restrictions.  AR at 827.  There is no indication that Dr.

8  Cohen purported to assess P.H.'s mental capacity, and neither the ALJ nor the Commissioner's

9  Motion acknowledges that Dr. Cohen considered P.H. "to be a poor historian regarding her current

10  medical symptoms and regarding her past medical history."  *See* AR at 823.

11      The Commissioner cites *Molina v. Astrue*, 674 F.3d 1104, 1113 (9th Cir. 2012),[14] as

12  authority that evidence of a claimant's normal interpersonal interactions during clinical interviews

13  undermines allegations of disabling mental limitations.  ECF No. 17 at 14.  But the relevant

14  portion of that decision upheld an ALJ's adverse credibility finding with respect to a claimant's

15  professed "inability to tolerate even minimal human interaction."  674 F.3d at 1113.  P.H. makes

16  no such claim in this case, and *Molina* does not hold that a claimant's ability (for example) to

17  maintain eye contact or a conversation is inconsistent with disabling Intellectual Disorder under

18  Listing 12.05.

19      The possibility that substance use has contributed to P.H.'s impairments, as the

20  Commissioner seems to suggest in citing a Danish medical study from outside the record (*see* ECF

21  No. 17 at 24 & n.14), does not negate a finding of disability.  Instead, the question is whether

22  P.H.'s condition would *improve* if she ceased substance use.  The Social Security Administration

23  has established a specific process to reach such a conclusion, generally requiring a comparison of

24  symptoms between periods of substance use and periods of abstinence.  SSR 13-2p, 2013 WL

25  621536, at *9 (Feb. 20, 2013); *see B.D. v. Kijakazi*, No. 21-cv-04493-JCS, 2022 WL 4793385, at

26  *8–9 (N.D. Cal. Sept. 30, 2022).  The ALJ made no such finding, and instead acknowledged that

27

28  _____

[14] Superseded on other grounds by 20 C.F.R. § 404.1502(a), as stated in *Vela v. Kijakazi*, No. 23-35075, 2023 WL 8592873, at *1 (9th Cir. Dec. 12, 2023).

P.H.'s "conditions persisted" during periods of abstinence, AR at 44, ultimately concluding that P.H.'s "substance use disorder[] is not a contributing factor material to the determination of disability", *id.* at 57.

None of these arguments provide substantial evidence for the ALJ's conclusion that P.H. was not disabled before August 28, 2018.

### F.     P.H.'s Symptom Testimony

P.H. asserts that the ALJ erred in discrediting her statements regarding the severity of her symptoms. ECF No. 13 at 26–27. P.H. is correct that the ALJ failed to identify specific statements that he found not credible, and to provide specific, clear, and convincing reasons to reject such testimony, both of which are required by Ninth Circuit precedent where, as here, an ALJ makes no specific finding that the claimant was malingering. *See Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1102–03 (9th Cir. 2014). But P.H.'s arguments suffer from similar defects in that she also does not identify any testimony at issue, nor does she explain how crediting any of her testimony would establish an earlier onset of disability. That said, P.H.'s February 2017 function report indicates heavily restricted activities that are at least in tension with the ALJ's conclusion that P.H.'s daily activities undermine her claim of disability. AR at 493–501.

Because P.H. failed to identify specific statements that the ALJ improperly rejected, the Court does not rely on the ALJ's overly conclusory treatment of such testimony as a reason for reversal. The Court nevertheless instructs the Commissioner on remand to comply with applicable precedent in assessing P.H.'s symptom testimony.

### G.     P.H.'s Other Arguments

The Court declines to address the remaining arguments in P.H.'s Motion, which are not addressed in her Reply. *See* ECF No. 13 at 25–28 (arguing, for example, that the ALJ abused his discretion by not taking testimony from a medical expert). Regardless of whether the Court agreed or disagreed with P.H.'s position, those issues would not change the conclusion that remand is necessary for further administrative proceedings. Such proceedings on remand to address the deficiencies addressed in this Order might either obviate the need to reach those issues

1   or alter the relevant considerations.

2   **IV.     CONCLUSION**

3          For the reasons discussed above, the Court GRANTS P.H.'s Motion for Summary

4   Judgment (except as to the request to remand for benefits without further proceedings), DENIES

5   the Commissioner's Cross-Motion for Summary Judgment, and REMANDS for further

6   administrative proceedings consistent with this Order.  The Clerk shall enter judgment in favor of

7   P.H. and close the case.

8          **IT IS SO ORDERED.**

9   Dated: March 22, 2024

10

11   _____

12   LISA J. CISNEROS
     United States Magistrate Judge

United States District Court
Northern District of California